Thank you, Your Honor. I would like to reserve ten minutes of my time to respond to the two government arguments. May it please the Court, I am Randolph Barnhouse and I appear today on behalf of King Mountain Tobacco Company in these two consolidated cases. One of these cases involves a federal excise or privilege tax imposed by the U.S. Department of Treasury's Alcohol, Tobacco, Tax, and Trade Bureau. I will refer today to that case as the tax case or the TTB case in my argument. The other case involves a fee. It's a FEDRA fee collected by the Commodity Credit Corporation, a private corporation wholly owned by the United States government. I will refer today in my argument to that as the fee case or the CCC case. Both the fee and the excise tax at issue today are imposed on the same travel with goods on a Yakima Indian allotment, and the same district court judge decided both cases against King Mountain Tobacco on summary judgment. Both of these cases require application of the Yakima Treaty. Although they share the treaty issue, each case involves additional and separate issues unique to the individual case, but because they share the treaty issue, I'd like to start there today. There's no dispute that Native Americans and ordinary affairs of life not governed by treaties or remedial legislation are subject to federal taxes. There's also no dispute that both statutes and treaties may exempt Native Americans from federal taxes and federal fees. The question this court and others have wrestled with is, what treaty language is sufficient to support an exemption? Analysis of the Yakima Treaty issues in this case requires the Court to first determine which of two conflicting rules it should apply to the required treaty interpretation here. The first of those rules is the — I will refer to as the express-exemptive language rule. To my knowledge, it's a rule that's only applied in this circuit and was the rule adopted in Ramsey, and it requires, as it says, express-exemptive language in the treaty. The second rule that's been adopted in six circuits, including this circuit, is the language-which-can-reasonably-be-so-construed rule. The Eighth Circuit and Holtzby Commissioner articulated this rule in 1966. This Court has adopted this second language-which-can-reasonably-be-so-construed rule in both Hoptowt in 1983, involving the Yakima Treaty, and Dillon in 1986. The D.C. Circuit in Muskogee adopted that reasonably-be-construed rule in 88, the Federal Court of Claims in Cook in 94, the Third Circuit in Lazor in 93, and recently the Tenth Circuit in Chickasaw Nation in 2001, a case affirmed by the U.S. Supreme Court. Both the Third Circuit in Lazor and the Tenth Circuit in Chickasaw specifically discussed and rejected the Ninth Circuit's express-exemptive-language rule. Only in some cases in this circuit has there been a move away from Holtz reasonably-be-construed test, but the approach hasn't even been uniform in this to apply the analysis of whether there is language in the Yakima Treaty that can reasonably-be-construed, as did the Court in Dillon and Hoptowt. Which test is applied is important to the outcome of this case, because once a court determines there is language that can reasonably-be-construed to support an exemption, the court must go to a second step in treaty analysis, which is application of the Indian Canons of Construction, which favor the Indian Party, something the District Court didn't do in either of these cases. The second step requires a determination of how the Indians understood the treaty promises made to them in the treaty. That requires a factual analysis of things like the minutes of the treaty, testimony from Yakima elders, and other evidence that's available to help the treaty. King Mountain doesn't necessarily lose under the express-exemptive language analysis, because this court in Ramsey held that the free access to public highways language is express. The court felt in Ramsey that that wasn't the piece of the treaty that was at issue in that tax on federal fuels that were traveling on the free access on the public highways. I thought your argument was that the Smimskin case controlled on Article III of the treaty rather than Ramsey. Absolutely, Your Honor, it does. And Smiskin dealt specifically with the travel provision in the context of a federal prosecution under the CCTA. So Smiskin analysis found that in that case, the free access and travel on the public highways language was sufficient. The key here is this is the to the extent the District Court relied on the Ramsey case and the express-exemptive language test, that's a test only applied in this circuit. And should the court apply that in this case, it would clarify this conflict in the circuits, which is something that this court tries not to. But the Smiskin case involved the State of Washington's rule. That's correct. I mean, it was a pre-notification rule imposed by the State of Washington, not by the Federal Government. And is there anywhere — I just didn't see where the treaty language that you're talking about applying here was implicated there. But maybe you can point — That's correct. Well, so it isn't. So then I can't figure out why then Sminskin would tell us the truth. There's part of the case you want to point me to that I ought to take another look at. Well, Smiskin provides the answer because of just what you noted, Judge McEwen. The — the rule said that before — the Washington State rule said that before cigarettes could be transported, there had to be pre-notification. The Federal Government was relying on the failure to comply with the State rule in the prosecution of Mr. Smiskin, the Federal prosecution. So although it was a Federal case, they were applying a State rule. And the Smiskin court looked to Cree and Flores, which were both State rule cases, in determining that this issue had been decided, that the State rule could not — could not stand in the face of a treaty challenge. So I'm still having some trouble. We don't have a State rule here, right? We only have a Federal rule. Yes. So that's why I'm having trouble with why Smiskin can really tell us anything. Smiskin tells you, in my opinion, Your Honor, Smiskin tells you a lot about application of the treaty, particularly if this Court adopts the can-reasonably-be-so-construed rule. And that's why I started with that discussion, because Ramsey, a case that was — involved a Federal tax, as does this one, not the Federal prosecution of activities under State law. In Ramsey, the Court adopted this express-exemptive-language rule. And that started back in Anderson and Warm Springs. It were both cases that adopted that rule from this circuit. But two cases in this circuit that didn't adopt that rule, Hoptowit and Dillon, adopted the rule that five other circuits have used. And in the Third Circuit in Lezor and the Tenth Circuit in Chickasaw have both criticized this Court's express-exemptive-language rule. So should this Court elect to follow Ramsey instead of, say, Hoptowit or Dillon and apply the express-exemptive-language rule, that would be a clear conflict of these circuits, two of which have already criticized that rule. What do we do then with Hoptowit, which was looking at Article II? Hoptowit was — Article II of the treaty. But there it was clear that it was income that was derived directly from the land. I mean, that's what the language in Hoptowit is. Right. So no matter which rule you apply, you have that language in Hoptowit. How do you get around that? Well, because in Hoptowit, it involved just Article III's exclusive use — I'm sorry, Article II's exclusive use and benefit in the context of income taxes. And this is not an income tax case. This is a privilege tax and a fee. And the problem with the income tax cases is they look at the source of income, whether it's directly derived from the land. That's not required under either the General Allotment Act or under the — or under the treaty analysis in this case, because what happens here is there is — the United States government promised free access to the nearest public highway. That's not — that is not offered here by the United States government. It's a breach of that promise, because the minute you start moving goods towards the public highway, they impose both the tax at issue and the fee at issue. So we have to choose between two standards of interpretation. Yes, Your Honor. Just thinking about the way that you were presenting your argument, the express exemption language would seem to me to lead to more certainty than reasonably construed language, which may depend on who is looking at the issues in the case. That's exactly right, Your Honor. And that's exactly the holding in Mazur in the Third Circuit and the holding in Chickasaw in the Tenth Circuit, which rejected the rule precisely for those reasons. It simply makes it impossible — Rejected which of the — The Ninth Circuit expressed exemptive language rule and adopted instead the whole Eighth Circuit may reasonably be so construed. And that's critical to this treaty analysis, which — So you say we should apply the reasonably construed language? Yes. My comment is that it would lead to less certainty than the express exemption rule. It certainly leads to less certainty for the government, because they are more likely to win, as both Mazur and Chickasaw said. And it ignores the Supreme Court's guidance and this Court's earlier guidance about application of the Indian treaties. These were people who — The treaty language used here was only a few hundred words. It was a jargon that was used for trade. And the one thing the Yakama Indians made clear was, we are a trading nation. They've been described as inveterate traders in the Smiskin case. And without the ability to have free access to the highways and free access to bring their goods to market, they couldn't do the things that the treaty negotiators promised, both for the U.S. and the Native Americans. I'm cutting into my — oh, no, I'm sorry. I was reading this wrong. I still have plenty of time. This is great. Well, so, you know, I'm not sure there's two different tests as expressed, because I'm — because I hear your argument, and it's an interesting one. But I'm looking at the language in Hoptowit, and it talks about, as you say, you can't have a tax exemption unless the language can be reasonably so construed. And then it says the intent to exempt from taxation must be clearly expressed. So I'm not sure that the Ninth Circuit has embraced a rule that is somehow internally inconsistent. It's like this continuum of a rule, and maybe that's different than the Third and the Tenth. But this panel, in any event, is bound by the Ninth Circuit. Yes, Your Honor. And in Dillon, Your Honor, the Court also used the may reasonably so construed. If this Court adopts the express-exemptive language, the — let me just rephrase that. The Third Circuit and the Tenth did feel it was two — these were two separate tests, which, as Judge Wintas points out, leads to completely different treatment of the Indians, depending on which circuit they're in. The can reasonably be construed language just needs to find some basis. And what Lazor said was — and these are all really tests that were developed to implement Supreme Court rulings on this very issue. And Lazor said, and I quote, Furthermore, because all Indian treaties were entered into long before the United States was an independent state, that the exemption must derive plainly from a treaty, together with its conclusion in Choctaw, that treaties cannot support an exemption without a provision concerning the liability of an individual to pay a tax upon income, to stand for the proposition that an exemption must be rooted in the text of the treaty. Furthermore, because all Indian treaties were entered into long before the passage of the income tax, the fact that the parties to a treaty did not negotiate with the federal income tax in mind is immaterial. So what Lasore – ultimately, all of the circuits need to follow this guidance by the Supreme Court, and the words they've chosen were derived plainly – and I'm sorry, that's at Lasore – that I just read, 11F3rd, 1180, and 1184. Sotomayor, what's the best Supreme Court case that we should look to for your proposition? I would say that the Court's cases that Lasore cited, the Chickasaw case that the United States Supreme Court affirmed out of the Tenth Circuit, the Tenth Circuit applied the can-reasonably-be-construed language. The Supreme Court affirmed the Tenth Circuit but did not discuss the two tests. And so I think the best cases are those cited and addressed by Lasore at that 11F3rd site that I gave the Court. You're down to your 10 minutes, if you would like to reserve. I would. I will reserve the rest of my time for you. Thank you. May it please the Court. Patrick Irda and Abby Wright for the United States. Your Honors, the district court correctly granted summary judgment both as to King Mountain's tax liabilities and as to its FEDRA obligations. Ms. Wright and I will be splitting time. I'll be addressing the tax issues, and Ms. Wright will be addressing the FEDRA issues. And I'd like to begin by turning straight to you. Do you have any proposed time split, or do you just want to work that out? I think that we're going to split it equally, but the first person sort of bleeds into their time, so I'll try to help you on watching the clock. I will try to sit down just as quickly as possible, Judge. That's not the point. I'd like to begin where opposing counsel left off, talking about that Chickasaw Nation from the Supreme Court. And I think it's a helpful case to frame what opposing counsel was talking about. In that case, the Supreme Court said that the canons don't apply when nothing in the language of the underlying statute or treaty suggests that the tribe should be exempted, and that's at 101 in Chickasaw Nation. And that's really what we're talking about here, because under either standard, under the Ramsey standard or the more generous standard that opposing counsel is arguing for, there is no exemptive language. Of course, Ramsey is the governing standard in this Court, so this panel is bound to apply it. But what's important is that this Court's decision in McKenna resolves any uncertainty as to whether there would be a discrepancy between the two standards. Plainly, there isn't. In Ramsey and in McKenna, they reach the same result. There is no ambiguity in Article II or Article III. That is the end result is, no matter which standard you apply, and we think that Ramsey is the correct standard, because it's a Federal taxed issue, and this Court has explained that Federal taxes are assessed under the Ramsey standard, that the Either way, we get to the same result. And it's important to know that we get to the same result because there is no ambiguity in the language, as this Court observed in McKenna, where it considered both Article II and Article III. Article II, according to the Court in McKenna, simply stands for the establishment of the physical boundaries and excluding non-Indians from using the land. And there's nothing in Article II that would suggest that a company is tax-exempt simply because it's on Indian land. So there is nothing in Article II that would provide a tax exemption that the tribe is asking for here. There's no express-exemptive language, and there's no ambiguity, according to this Court. Likewise, in Article III ---- Is it tax-exempt if they are addressing products that are taken from the land, derived from the physical property that's subject to the treaty? That's a great question, Your Honor, because in this Court's decision in Hop-To-It, the Court said to the extent that there might be a tax exemption, that's as far as it would apply to the land and any income directly derived. Obviously, the tax that we're talking about here, which is an excise tax on the manufacturer of tobacco products, is wholly outside that framework. It's not directly derived income or a tax on the land itself. Instead, it's a tax on the privilege of doing something, manufacturing tobacco products like cigarettes. Even though the raw material comes from the land itself? That's correct. So as this Court noted in McKenna, this is a multi-step process. King Mountain ships their tobacco and combines it with other tobacco to be processed, and then the tobacco is returned to be manufactured into tobacco products, which is the act that's being taxed. And so it's not something where you're taxing either the income from the land or the land itself, something like the tobacco crop. Would your answer change if King Mountain were the allottee? Well, that actually goes more to the General Allotment Act question. So I think that if King Mountain were the allottee, which of course it couldn't be because it's a company and allottees are... I understand, but let's say it were Mr. So-and-so, you know, who was an allottee. Well, and again, just to be clear for everyone... Co-proprietorship. Right. And we're talking about, again, the General Allotment Act. No, it would not change because the excise tax is not either a tax on the property or a tax on income directly derived. It's a tax on the privilege of being allowed to manufacture tobacco products. So under the General Allotment Act, that does not reach this tax and does not exempt this tax. Of course, as Judge McKeon pointed out, King Mountain is not the allottee, so the General Allotment Act does not shield them. Now, going back to the treaty language, Article III also does not exempt the tax at issue. Article III instead talks, at its greatest extent in Ramsey, about the tax exemption for the right to travel. Here there is no travel that's being taxed. What's being taxed is, again, the manufacture of tobacco products. Just to be clear, there's some hint in the briefs that there's a transportation aspect of that. That's what I wanted to ask about. Okay. Great. So that is actually the moment in which the tax is determined, the tax attaches when the tobacco product is manufactured. You can actually — you can take the tobacco itself that's grown on Indian land, sell that. That's not a problem. That's not taxed. Would that be accurate? I think that that's right. Just the tobacco, for example, the leaves. The crop. If you had the crop — so crops, for example, would, under Hoptewit's assumption of an exemption, would probably be in that income directly derived. So if you sold your crop under the Hoptewit reading, which said we're going to ascribe the same meaning as in the Pomen case interpreting the General Allotment Act, then that income would seem to fit within that exemption. But that's not what we have here, obviously. What we have here is a tax on something separate, the manufacturer of tobacco products. So in that case, it would not — the exemption doesn't fit. Once you take the tobacco product and make cigarettes out of it, you say that's when the tax applies. Exactly. And the — Or other products. Right. And the question of removal — what does removal mean? Removal is simply the point at which the tax is determined. So the manufactured tobacco products, which have already been taxed in a metaphysical sense, are then kept in a bonded warehouse. For accounting purposes, it's when the tobacco products are removed from bond, whether that's just a portion of the warehouse and the tobacco products are taken out of that portion, that's when the tax is determined. So that's under 5703 of the code. So really, the tax attaches to the manufacturer of the tobacco products. That's 5701 of the code. And then 5703 is when the tobacco products tax is determined. Now, that has nothing to do with transportation, and it has nothing to do with travel on highways. So the Article 3 of the treaty does not apply to exempt the manufacturer's excise tax, nor does Article 6 of the treaty apply. This was an argument first raised in this court, and it's waived. Even so, this court's decision in Dillon indicated that non-alienability and non-taxability are distinct concepts and that Article 6 does not provide an exemption for taxation. If there are no further questions on the treaty or the General Allotment Act, I will turn the mic over to Ms. Wright. Well, I do have a question. Sure. A question on this forfeiture issue. Sure. And that's a tax issue, right? Yep. Okay. That's me. Okay, that's you. Yeah. All right. It's a little confusing here because the government owns the land, correct, or has title to the land, but they're arguing, in effect, that even if you get all the way through all of your arguments and then you get to the end, that there's still a forfeiture problem. And that, to me, is a little more complex, and I would appreciate your comments on that. Sure thing. So, there are a couple of different responses. First of all, the General Allotment Act very specifically shields from fee and encumbrance allotted land. Okay? So, the government believes that the General Allotment Act takes forfeiture off the table. And it takes, quite frankly, the normal tax mechanisms of collection, liens and levy, off the table, and that's noted in our brief when we talk about the Treasury regulations. The General Allotment Act shields this property. And of course, just to remind the Court, we're talking about a third-party piece of property, not property owned by King Mountain. Okay? So, forfeiture is, of course, a drastic remedy, and the government believes that the General Allotment Act controls. That doesn't implicate the tax. The tax is a good tax. The tax is valid. It just means that we can't collect the tax off of the property, because the property is protected by the General Allotment Act. When you say property, are you talking only real property as opposed to personal property? We're talking about the real property of the allotment. Okay? And then it also goes the forfeiture question also, if you got past the General Allotment Act, which we don't think you need to, you'd run into this Court's precedent about only property being used as an act of aid is subject to forfeiture. Here, to the extent that the misstatement of tax would constitute a violation of the internal revenue laws that would subject someone to forfeiture, which is, of course, an incredibly broad reading for such a drastic remedy, then we would say that the real property is not used as an act of aid. The tax and the statement of the tax have to do with the manufacturer of cigarettes in the factory. And so the real property is just where the factory is located. It's not an act of aid of the violation of the internal revenue laws. So even if the General Allotment Act didn't apply, this Court's precedent regarding act of aid would apply. And again, this is all consistent with the way that the Treasury regulations deal with this. Indian trust property is not subject to lien and levy, which is what the IRS usually uses to collect taxes. And quite frankly, the Internal Revenue Manual also cited in our brief notes that the forfeiture statute, even though it has broad language, is not intended to be a substitute for collection. So just because somebody gets their taxes wrong doesn't mean that it's a violation of the internal revenue laws that would subject them to forfeiture, and certainly that it would subject the property of a third party to forfeiture. This tax that we're talking about, this is a tax that's imposed on all tobacco manufacturers? That's correct. Not restricted to King Mountain? That's correct. And it's imposed at a certain point in the production process? It's imposed at the manufacturer of whatever tobacco product is being manufactured. Okay. There are no further questions? Good morning. Abby Wright on behalf of the United States. I'm here to address the FEDRA issues, which we haven't discussed yet. But I'll begin with we've talked about the treaty arguments. I think those apply with equal force to the FEDRA assessments at issue here. King Mountain also argues that FEDRA is unconstitutional. The district court correctly rejected that argument, relying in part on the Eleventh Circuit's decision in Swisher. That decision was issued 10 years ago and rejected arguments that were virtually identical to those advanced here. FEDRA assessments are applied to the gross volume of sales that every tobacco manufacturer has. While they were applied, the program is over. FEDRA just imposed an obligation to pay money. A mere obligation to pay money does not make a takings claim. So at most, King Mountain has here asserted a substantive due process claim. For the reasons the district court and the Swisher court explained, FEDRA does not pose any substantive due process problems. It's not retroactive, which was the primary reason that the Eastern Justice Kennedy and Eastern Enterprises found a substantive due process violation was because the Cole Act in that case was retroactive. FEDRA assessments are based, or were based, as I said, on the quarterly number of cigarettes or roll-your-own products that were manufactured. On the treaty point, if the United States is wrong on the treaty point with respect to the excise tax, does the same result then inure to the FEDRA? I think that the court should analyze the two in the same way. In the same way. Yes. Okay. Yes.  I think it was a fair request to get more information, and they did get more information. So the United States filed suit. King Mountain, during the process of responding to the complaint, it became clear that King Mountain had not been given the hearing they were supposed to get under the under FEDRA. And so it was remanded back to the agency. And at that point, the agency provided King Mountain with additional information, created Excel spreadsheets that gave King Mountain sort of a layperson's understanding of how the assessments were calculated. And then at the telephonic hearing, counsel said that he didn't have any objections or further questions about the amount. So when it came back to district court, I think the district court quite reasonably said there's substantial evidence in this record. And even in this court, they haven't explained what kind of information they're looking for, what they think discovery might uncover. My final point on that is that this is an administrative record case, so this court is looking at whether the administrative record contains substantial evidence, and the district court correctly concluded that it did. I see your point is that you had nothing else to provide that related to the case? That's right. They haven't in this court said, you know, we think it was wrong for this reason, so give us more information about that. There were some questions about offsets. And so CCC gave a very detailed, you know, accounting. And we put in our supplemental excerpts of record a couple of sample quarterly assessments, so this court can take a look and see that they are quite detailed. And the calculations are very straightforward. They're based on the amount of excise taxes paid and your share of the market. Will you be addressing whether the imposition of the FEDTRA assessments amount to a takings? So our position is that they do not — Or violate the takings procedure. The claim is not the appropriate way to look at it here, because FEDTRA imposes an obligation to pay money. It's not tied to a specified property interest. This — the Federal Circuit sitting in bank in Commonwealth Edison, a case we cite in our brief, dealt with a uranium requirement that utilities pay for uranium remediation, and explained there that a mere obligation to pay money, which was an issue in that case and an issue in our case, doesn't give rise to a taking analysis unless it's tied to a specified property interest. And so when King Mountain specifies the property interest they're talking about, that goes back to the Yakima Treaty. And so, as we explained in our brief, I think this court needs to first decide the Yakima Treaty issues and determine whether or not the property right that King Mountain claims is there. Otherwise, we really just have a challenge to a tax and a fee, which the Supreme Court has made clear does not amount to a taking. But what was the purpose of the — the underlying purpose of the FEDTRA tax? So the FEDTRA in 2005, the tobacco farmers were transitioned from a historical decades-long practice of quotas and price supports to a new system, free market system. And so it was expected, and it in fact occurred, that tobacco prices dropped pretty significantly. Congress was concerned about that, and so wanted to transition, make a gradual transition from that historical quota system, very highly regulated tobacco system. Is this to stabilize the price of tobacco? To stabilize the market. I think there was a concern that if prices dropped too quickly, you would have the bottom fallout of the tobacco market. And so the folks who stood to benefit from that were cigarette manufacturers because the prices were going to be lowered. So Congress imposed a fee, an assessment on cigarette manufacturers to fund the gradual transition. And as the Eleventh Circuit held in Swisher, this doesn't — you know, it's not retroactive and does not pose any kind of constitutional problem. If there are no further questions, we ask the district court be affirmed. Thank you. Mr. Barnhouse? What counsel just asked you to do is overrule Caponin, a United States Supreme Court case that the Court is bound by, not Ramsey, Hoptow, or McKenna. Could you spell that for me? Certainly. C-a-p-o-e-m-a-n. And Caponin is the seminal case, the United States Supreme Court case, that ruled that under the Quinault Treaty, exclusive use was sufficient to require the treaty canons of construction. And that was in a court case where this Ninth Circuit ruled the same way as did the district court. Caponin was a General Allotment Act case, and it was on — it had to do with income. So courts have looked at this directly-derived issue in the context of income. But this is not an income tax case. This is not a privilege-to-manufacture case. If my client exported every cigarette they made, they wouldn't pay this tax. It's not on the manufacturer. It's on the movement of goods. Imported cigarettes pay it when they're moved out of bond. So it's — they could call it a two-tax. They — the government sees it a little bit differently. The cigarettes aren't going anywhere when the tax is imposed. It's of the moment. They're in the warehouse. They're wherever. That's incorrect, Your Honor. Okay. And they're, quote, released. I suppose that's a computer transaction. That's also incorrect, Your Honor. That's incorrect? Yes, Your Honor. Okay.  They are imposed — the minute they are moved, they are transported out of bond, whether it's from — But by that time, the product itself, the tobacco itself, has been manufactured into a product ready to sell, such as a cigarette or tobacco for pipes or any other retail sellable product. Right, Your Honor. So long as it's manufactured and it sits in bond, no tax. It sits there tax-free. If it's transported in bond to another manufacturer, it sits there in that other — it could be transported across the country to the Seneca Nation. It sits there tax-free. It's only at the moment that it's transferred out of bond that it travels that the tax is imposed. And the — this Court and the Supreme Court have consistently said it doesn't matter how they describe the tax. It sounds like it's taxed when it's ready to go to market. It's not even then, Your Honor. It's taxed when it's moved and it's transported to the public highway, that movement, even if it then sits in a warehouse. Even if it's going from one reservation to another? If it's going in bond, it's not taxed. The minute it's removed from bond, the minute it's transported is when they impose the tax. And so they don't impose the tax on manufacturers in Canada. They impose the tax on the importer who brings it into the United States. So it's just simply wrong to describe this as a tax on manufacturing tobacco. That's not what it is. It's a tax on removal, as they've — as they admitted today in the beginning of the argument. And that's the case whether it's been manufactured or not? Yes, Your Honor. So, for example, traditional-use tobacco that goes out for retail sale is 100 percent grown on the Yakima Nation. The government tells us it's on manufactured tobacco or tobacco that's blended with tobacco from outside the reservation. It's on tobacco for retail sale, Your Honor, so that if you take — if you take traditional-use tobacco — tobacco is just a leaf. So once it's made and processed, even for traditional use, so it's not in a tube, it doesn't have a filter — My thinking has been confused because I — you're suggesting that you can take move them out and — and what happens? If you just take the leaf and you send it to a blender, no tax. Okay. But if you take the leaf and you convert it into a cigarette and then put that out, what's wrong with that? If you — if you can — if you take it into your plant and turn it into a cigarette, you — first you have to — Isn't that manufactured? You have to — well, I don't know, Your Honor. We didn't — it's unclear from the district court at what point — and that's a very good point. At what point along the process? Once you pick it, it's not — But this is the end process. But you dry it? I mean, I guess I'm having trouble with this because in Capamon, they were talking about logging, right, or timber? Yes. Yes. And at the end of the day, they're basically saying, you know, the major value of this land, which is the trees growing on the land, you cut them down, you ship them out, it's all the same thing. This is not the same thing because we're — in the end, we're talking about a manufactured product. So in Capamon, they're not talking about, I guess, what I'll call boards in the timber industry. They're talking about the raw logs. And you're talking about raw tobacco, but it's turned into boards or cigarettes or manufactured products. So it's not the same as Capamon, it seems to me. It's exactly the same, Your Honor. I'm sorry I've been around. Okay. But I guess I'm having some trouble with that, though. The reason it's the same is because as this Court in Anderson confirmed and as Capamon confirmed, it's not the money that's the issue. I understand. It's the encumbrance. And so when they say the General Allotment Act does not allow the encumbrance, that's exactly right. The Internal Revenue Service in Capamon was not — the money had been paid. The taxpayer had to pay their income to challenge that tax. So there was no issue in Capamon whether the IRS was then going to come down and take that allotment. The issue was whether that tax could impose a lien or forfeiture. And because the sale of the logs, if they hadn't paid, they could have — they could under the statute have imposed a lien or forfeiture. Not whether they would have or whether they were likely to. In Capamon, they were — it would not have been an issue because the tax had been paid. The issue is whether under the tax structure a lien or forfeiture can occur. And under the TTB tax, it already has occurred. It occurs immediately. It's not up to the executive branch. The statute says, and it doesn't matter who produces it, if property used for the sale — for the production of the product is not — if property is used for that and the tax is not paid, that — there are no more property interests in that, and it shall be forfeited. That's the statute. And it's cited in the reply. So it doesn't — so for them to say, well, we might not do it or we have a manual that says we won't do it or — or — they've already done it under the — unless they're in violation of the statute, and they can't be. It's hard. I understand with cigarettes, if this were fish or logs or gas, it would be easier. Cigarettes are hard. Nobody likes cigarettes, but they're legal. I don't think it's that we don't — people don't like them. They may not like them, but it's — the crop, if it were tobacco leaves, we'd have one situation. We don't have tobacco leaves. We don't have, like, Kaepernick or how we pronounce it, Kaepernick's timber. We don't have logs. If it were an income tax case, I'd agree with you. But this is not an income tax case. But I don't see the difference when the principle that's being announced is whether the, you know, the major value of all this is what's happening on the allotted land. It's day and night different, Your Honor, because in an income tax case — so if I have income from a hotel, and I'm leasing the hotel, my business is, and I don't pay my income tax, you cannot place a lien or a forfeiture on the property. But if you — if my client moves their tobacco out of bond, and they don't pay the tax, which a portion of it they haven't paid — By tobacco, you mean raw material. Well, if it's — You mean the leaves, just the leaves. No, Your Honor. If they — the leaves are processed. So if someone wants to use — That's — but here's kind of the dividing line, then, it seems, once you process. Right. Just like the logs. The logs on just the trees, you can't tax that. But when you take that — the tree, the raw material, and you process it into boards, then it's taxable. I mean, is that fairly accurate or no? It's an income tax, but this isn't an income tax case. So it doesn't matter if these cigarettes were ever sold. If they were destroyed in transit and never sold, and there was no income from these cigarettes, the tax still had to be paid. And if the tax wasn't paid under this statute — Because if it were sold, then it's a sales tax issue. Exactly. Here, it's a manufacturing issue. And in McKenna — I'm sorry, but that just was not the holding in McKenna. McKenna held that this was not a tax or a fee, and it was a state law case, and they said there was no transportation involved because it was a sales tax — a sales issue, not a tax. It was placed into escrow. So McKenna has no applicability because these are Federal cases under different rules. Kopoman is the case that's binding. It's a U.S. Supreme Court case, and it's binding on the Court here. As to the FEDRA fee, I want to just talk briefly about that. It is retroactive. As counsel just told you, this was a — this was payment for an historical quota system. So in 2004, when King Mountain opened their doors to make cigarettes and FEDRA was set up, King Mountain had to pay the historical costs that were implicated by an earlier system of fee. And the difference between a fee and a tax is significant in this case. My time is up. Thank you. Right to the minute. Thank you. The cases just argued, United States v. King Mountain Tobacco, are submitted. I would like to thank counsel. It's always a pleasure to have lawyers who know all the cases and are so knowledgeable in the area, and also the briefing has been very good on all sides. So thank you very much. Case is submitted. Our next case for argument, then, will be Jose Maria Garcia Martinez v. Sessions.
judges: Fuentes, Fernandez, McKeown